# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-1035

ROBERT GUNVILLE and
RICHARD OAKLEY,

*Plaintiffs-Appellants,*

*v.*

ROGER WALKER, JR., Director of
the Department of Corrections of the
State of Illinois, and DONALD J. SNYDER,
former Director of the Department of
Corrections of the State of Illinois,
in their individual and official capacities;
MICHAEL M. RUMMAN, former Director of
the Department of Central Management
Services of the State of Illinois, in his
individual capacity only; and JAMES P. SLEDGE,
Director of the Department of Central
Management Services of the State of Illinois,
in his official capacity only,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 05-3050—**Jeanne E. Scott,** *Judge.*

ARGUED JANUARY 9, 2009—DECIDED OCTOBER 9, 2009

Before MANION, ROVNER and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge*.  Robert Gunville and Richard Oakley were terminated from their employment with the State of Illinois after a change in the governing political party. Although they would have been eligible to be reemployed at positions throughout the state under prior interpretations of personnel rules, the new administration applied the rules much more narrowly, resulting in a lack of opportunities for reemployment for the two men. They charged certain state officials with violating their rights under the First and Fourteenth Amendments. The district court granted summary judgment in favor of all of the defendants and we affirm.

## I.

Gunville and Oakley were employees of the Illinois Department of Corrections ("IDOC") when the Republican party lost control of the governor's office to Democrat (now ex-governor) Rod Blagojevich in January 2003. Gunville had been working for IDOC since 1985, beginning as a stationary fireman and working his way up to the position of plant maintenance engineer II by 1992. In 2002, he was assigned to oversee the construction of two new prison facilities: Hopkins Park Correctional Center in Kankakee County, and Grayville Correctional Center in White County. Gunville also retained some duties at Thomson Correctional Center, but he was the only state employee working at Hopkins Park and Grayville in early 2003. His position description listed Kankakee

County as the his county of employment. Oakley too began working for IDOC in 1985, and also rose through the ranks to the position of statewide commander of the Special Operations Response Team ("SORT"). Oakley held the rank of colonel at the beginning of 2003, overseeing three regional SORT commanders. Although he was the state-wide SORT commander, his position description listed Sangamon County as his county of employment.

When the new administration took office in January 2003, the governor directed all state agencies to find ways to improve efficiencies and save money to address a statewide budget crisis. In the ensuing months, the new administration halted construction on the Hopkins Park and Grayville correctional centers. Gunville, whose main job responsibilities related to those new facilities, was laid off as of May 30, 2003. Oakley was also laid off on May 30, 2003, following a reorganization of the SORT command structure. SORT was consolidated from three regions into two. One of the regional commanders, Cecil Polley, was demoted from captain to lieutenant and his pay was cut. At this lower rank and pay, Polley was then appointed the new statewide SORT commander, although his duties changed little from his prior regional position. Gunville and Oakley believed they were targeted for layoffs because of their political affiliation. Gunville was an active member of the Republican party; Oakley had voted as a Republican in some primaries. The Republicans had controlled the executive branch in Illinois for twenty-six years when the new Democratic governor took office.

In 2003, certain correctional facilities in Illinois were empty because IDOC lacked operational funding for them. Donald Snyder was the Acting Director of IDOC until June 1, 2003, when Roger Walker became the Director. Michael Rumman was the Director of the Illinois Department of Central Management Services ("CMS") from January 2003 through June 2005. James Sledge is now the Director of CMS. CMS is the agency that administers the personnel rules for all state agencies. Julie Curry, the new Deputy Chief of Staff for the new governor, was responsible for several state agencies, including IDOC. Snyder hired Jim Underwood as the Personnel Manager of IDOC. At the time of his hiring, Underwood had no experience in personnel matters and was not interviewed for the job, but he had been a political supporter of both Curry and Blagojevich. Curry told Underwood to look for positions in IDOC that could be eliminated, and Underwood, together with his retiring predecessor, Nanci Bounds, compiled a list. Underwood asked Bounds to provide a list of positions created under the administration of George Ryan, the outgoing Republican governor, and Bounds complied with that request. Underwood and Bounds reviewed the IDOC organizational chart and together identified positions that were no longer needed. The two also considered for elimination certain positions that did not appear on the organizational chart. Without discussing the list with Snyder, Underwood presented the resultant list to Curry. Underwood conveyed Curry's ensuing approval to Bounds, who then prepared the layoff package for the May 2003 layoffs. In addition to layoffs, some

departments underwent reorganizations at the same time. Snyder forwarded the layoff package to CMS in early May 2003, and CMS approved the layoff, which eliminated the positions held by Gunville and Oakley. Twenty other IDOC positions were eliminated at the same time, and all captains' positions were eliminated, a decision that affected more than two hundred IDOC employees. Gunville and Oakley were eligible for recall or reemployment under the personnel rules of the Illinois Administrative Code, but neither were reemployed by IDOC following the layoff.

Gunville had voted as a Republican in primaries from 1998 to 2003, and believed Snyder saw him at certain Republican functions, including fundraisers. Oakley's only political activity was voting, and he consistently voted in Republican primaries while he was working for IDOC. Gunville and Oakley concede that Walker and Rumman did not know them and had no personal role in decisions concerning them. The district court declined to consider an additional piece of evidence concerning the defendants' knowledge of the plaintiffs' political affiliation. Kathleen Danner, an assistant to the personnel manager at IDOC, testified in her deposition that she had been told that voter records were pulled for certain personnel decisions. The district court found this testimony was inadmissible hearsay, and declined to include it in the summary judgment analysis. The evidence that the defendants even knew the plaintiffs' political affiliation was thin; the evidence that political affiliation motivated the layoff decisions is even thinner, as we shall see.

Gunville and Oakley claim that their First Amendment rights were violated when they were terminated because of their political affiliation. They also alleged that their Fourteenth Amendment rights were violated when they were not placed on reemployment lists for all of the counties in which they had been employed, but rather were placed only on lists for their last county of employment. The district court granted judgment in favor of the defendants on all counts, and the plaintiffs appeal.

## II.

On appeal, the plaintiffs urge us to reconsider the district court's decision to exclude as hearsay the testimony of Kathleen Danner that she had been told that voter records were pulled for certain personnel decisions. Gunville and Oakley also contend that they have produced sufficient evidence to create an issue of material fact regarding whether they were terminated because of their affiliation with the Republican party, or their lack of affiliation with the Democratic party. Finally, they complain that the Due Process Clause of the Fourteenth Amendment was violated when IDOC interpreted the State's personnel rules to place laid-off employees on reemployment lists only for the last county of their employment, rather than for all counties in which they had ever been employed, as the prior administration had done.

**A.**

To make out a *prima facie* claim for a violation of First Amendment rights, public employees must present evidence that (1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech caused the employer's action. *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008); *Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009).[1] The plaintiffs' affiliation with the Republican party is protected under the First Amendment, and they both suffered the loss of their jobs. *See Rutan v. Republican Party of Illinois*, 497 U.S. 62, 64 (1990) (the First Amendment forbids government officials to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved) (citing *Branti v. Finkel*, 445 U.S. 507 (1980)). *See also Powers v. Richards*, 549 F.3d 505, 509 (7th Cir. 2008) (termination of certain lower-level government employees because of their political

---

[1] Until the Supreme Court's recent decision in *Gross v. FBL Financial Servs., Inc.*, 129 S. Ct. 2343 (2009), plaintiffs could prevail in a First Amendment § 1983 action if they could demonstrate that their speech was a motivating factor in the defendant's decision. After *Gross*, plaintiffs in federal suits must demonstrate but-for causation unless a statute (such as the Civil Rights Act of 1991) provides otherwise. *See Fairley*, 578 F.3d at 525-26. In this case, the outcome would be the same with either measure of causation because the plaintiffs cannot demonstrate any tie between their political affiliation and the decision to terminate their employment.

affiliation may violate the First Amendment); *Carlson v. Gorecki*, 374 F.3d 461, 464 (7th Cir. 2004) (with limited exceptions, public employees may not be made to suffer adverse employment actions because of their political beliefs); *Nelms v. Modisett*, 153 F.3d 815, 818 (7th Cir. 1998) (dismissals of public employees for reasons of political patronage are violations of the First Amendment unless party affiliation is an appropriate requirement for the position involved). The only factor at issue here is whether those layoffs were caused by an improper consideration of their political affiliation. In order to demonstrate that the defendants were motivated by political affiliation in determining which employees to terminate, the plaintiffs must first show that the defendants knew of their association with the Republican party. *Nelms*, 153 F.3d at 819.

We begin with the deposition testimony of Kathleen Danner because, without this evidence, the plaintiffs have virtually no evidence that any of the defendants (except for Snyder, who was aware of Gunville's party affiliation) knew about their political affiliation, much less any evidence that the defendants were motivated by that affiliation in making layoff decisions. Danner testified that, during this same time period, all of the IDOC captains and all of the IDOC Assistant Deputy Directors were also on the chopping block. She stated that voting records were pulled during the captains' layoff. She knew that voting records were obtained for all of the IDOC captains but was not aware that they had been pulled for any other employees. She did not

know who pulled the records. Her testimony on how she learned this information was brief and is worth repeating:

Q: How did you become aware that voting records had been pulled?

A: It came up in a conversation with the captains' layoff.

Q: Who was—who told you that?

A: Mr. Underwood.

Q: Did he pull them?

A: No, I don't believe he had the ability to do that.

Q: What did Mr. Underwood say to you in regards to the voting records?

A:[2] He told me how many captains were registered Republicans versus Democrats.

Q: Did you ask him how he knew that?

A: I knew he obtained that information from the Governor's office.

Q: Did he say anything else to you about the voting records?

A: No.

R. 53, Ex. 5, at 40-42.

---

[2] We have omitted an objection from opposing counsel immediately before this answer, regarding the hearsay nature of the potential answer.

The district court found that Danner's testimony about Underwood's statements was inadmissible hearsay. The court also found that Danner's statement was irrelevant because it related to a different layoff—the layoff of IDOC captains—and because the plaintiffs did not tie Underwood's claim to any of the defendants here. Gunville and Oakley now argue that Danner's testimony was not hearsay. They characterize Underwood as a co-conspirator of Snyder, and contend that Danner's report of Underwood's statement falls under the co-conspirator exception of Fed. R. Evid. 801(d)(2)(E). They also cite *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265 (3d Cir. 2007), in support of their claim that this evidence is both admissible and relevant.

Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment. *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible evidence will not overcome a motion for summary judgment). *See also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) (evidence relied upon at the summary judgment stage must be competent evidence of a type otherwise admissible at trial). A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment. *See Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) (inadmissible hearsay is not enough to preclude summary judgment); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial); *Bombard*, 92 F.3d at 562 (inadmissible

hearsay from an affidavit or deposition will not suffice to overcome a motion for summary judgment).

When a district court's decision to grant summary judgment is premised on an evidentiary finding, we use a combined standard of review. *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007). We review the district court's decision that a particular statement is not admissible as hearsay under an abuse of discretion standard. *Id*. But we review the district court's grant of summary judgment *de novo*, considering all of the evidence in the light most favorable to the non-moving party. *George*, 535 F.3d at 538; *Schindler*, 474 F.3d at 1010. Danner's deposition testimony was classic hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c); *United States v. Harris*, 281 F.3d 667, 671 (7th Cir. 2002). Danner claimed to know that voting records were accessed and used because Underwood told her so. Underwood's statement, as repeated by Danner, was not made at a trial or hearing, and the plaintiffs seek to use it to prove that voting records were accessed and used to make layoff decisions. Thus, Danner's version of Underwood's statements is not admissible and will not overcome a motion for summary judgment. *See Collins v. Seeman*, 462 F.3d 757, 760 n.1 (7th Cir. 2006) (affirming district court's refusal to consider in its summary judgment decision an investigator's summary of unsworn statements); *Eisenstadt*, 113 F.3d at 742. The district court did not abuse its discretion in finding that the statement was inadmissible hearsay.

Nor are we persuaded that Danner's statement would be admissible under the co-conspirator exception to the hearsay rule. Under Fed R. Evid. 801(d)(2)(E), a statement is not hearsay if the statement is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy. *See also United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009) (party seeking admission of statement under Rule 801(d)(2)(E) must demonstrate that a conspiracy existed, that the defendant and the declarant were members of the conspiracy, and that the statement sought to be admitted was made during and in furtherance of the conspiracy). Gunville and Oakley argue that there was an "implicit plan to eliminate longstanding employees of the former republican administration . . . in order to make room for democrats and supporters of the new Governor." Brief of Appellants, at 28. According to Gunville and Oakley, circumstantial evidence shows the "appearance of some undocumented conspiracy." *Id*. They posit that Underwood and Snyder, one of the defendants here, were co-conspirators. In support of this undocumented, implicit conspiracy between Underwood and Snyder, Gunville and Oakley offer literally no evidence. They speculate that Underwood must have been hired because of his political affiliation because he was not otherwise qualified for his job. Snyder initially refused to answer deposition questions based on his Fifth Amendment privileges, and the plaintiffs assert that (unspecified) negative inferences may be drawn from that refusal. The plaintiffs fail to note that

they never sent Snyder a notice for a deposition.[3] They assert that both Snyder and Underwood wished to keep their jobs and therefore had an incentive to comply with the governor's wishes. But they fail to cite any admissible evidence to support the existence of a conspiracy. Nor do they propose any theory of how Underwood's statement to Danner was in furtherance of that unnamed, unsupported conspiracy. In order to draw an inference in favor of a nonmoving party, there must be some evidence from which to draw the inference. But there is nothing more here than speculation and innuendo. *See Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir. 1999) (a party must present more than mere speculation or conjecture to defeat a summary judgment motion). We cannot construct this unsupported conspiracy out of a void, and then assume that a particular statement was made in furtherance of that conspiracy.

*Galli* advances the plaintiffs no further in seeking to admit Underwood's statement. The only similarity between *Galli* and this case is an allegation that public

---

[3] After the defendants filed their motion for summary judgment, Snyder's attorney notified the plaintiffs' counsel that, because Snyder was the subject of a federal investigation, he would invoke his Fifth Amendment privileges at any deposition. Subsequently, Snyder's counsel informed the plaintiffs' lawyers that Snyder would testify at a deposition regarding matters contained in an affidavit he submitted in support of the defendants' motion for summary judgment. The record contains no notice of deposition for Snyder nor any motion to compel his testimony.

employees were terminated due to party affiliation. *Galli*, 490 F.3d at 269. In support of that claim, Galli produced evidence that the vice chair of the defendant commission admitted to her that the commission was "letting Republicans go" because "some Democrat wants the spot." *Id*. This statement was the admission of a party opponent, admissible under Rule 801(d)(2). There was no co-conspirator statement at issue in *Galli*. Gunville and Oakley have no viable legal theory that would support the admission of Danner's statement.

Oakley concedes that he is unable to prove that any of the defendants knew of his political affiliation. Gunville's only other evidence that the defendants knew his political affiliation and used it to make layoff decisions is his claim that Snyder saw him at Republican functions. At most this shows that Snyder knew Gunville was a Republican. As for evidence that political affiliation was the cause of their termination, Oakley claims he had been told that a "gentleman in personnel" was working off of a voter list to determine which positions to eliminate.[4] The plaintiffs make no

---

[4] On page 8 of the Appellants' Brief, the plaintiffs attribute this testimony to Oakley, citing R.47, Attachment 11, at pages 140-43. Nothing on those pages of Oakley's deposition, however, references anyone in personnel working from a voter list for any purpose. Gunville, however, did testify at pages 140-43 in his deposition, that George DeTella told him that a "gentleman working in personnel" was working from a voter list produced by the governor's office. R. 47, Attachment 10, at 140-

(continued...)

attempt to circumvent the obvious hearsay problems with this claim. Gunville and Oakley also argue that the persons determining which positions to eliminate had no experience in personnel matters and did not understand the structure of IDOC. From this, the plaintiffs ask us to infer that the stated reason for the layoffs, a material reorganization to enhance efficiency, was a pretext. That the decision-makers may have been unqualified to conduct the task of restructuring, however, tells us nothing about whether the motive for the layoffs was improper. There is a sizable leap from conducting a restructuring ineptly to conducting it for improper purposes. We decline to take that leap in the complete absence of any evidence pointing in that direction. The plaintiffs have failed to create a genuine issue of fact regarding whether the defendants used political affiliation in determining who would be laid off. *See Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001) (factual disputes are "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmovant). Summary judgment in favor of the defendants on the First Amendment claims was therefore appropriate.

## B.

Gunville and Oakley also contend that the defendants violated their due process rights when they failed to

---

[4] (...continued)
43. This testimony suffers the same hearsay problems whether it was uttered by Oakley or by Gunville.

place them on appropriate reemployment lists, thereby preventing them from being rehired to other civil service positions within IDOC. According to Gunville and Oakley, before the Democrats gained control of the governorship, CMS had interpreted the relevant personnel rules in the Illinois Administrative Code broadly to allow laid-off employees to qualify for positions in any former county of employment and also to pick from a list of positions, within their job qualifications, that were available throughout the state. The Illinois Administrative Code ("IAC") governs the process for the recall of laid-off employees:

> The Department shall establish and maintain a reemployment list, by class and agency and county, or other designated geographical area approved by the Director before layoff. A certified employee, except those who are in the Senior Public Service Administrator or the Public Service Administrator classes who are covered by subsections (b) and (c) below, who has been indeterminately laid off shall be placed in order of length of continuous service as defined in Section 302.190 on a reemployment list for recall to the first available assignment to a position in the class (or related classes with substantially similar requirements and duties) and agency, and county, or other designated geographical location or area in which the employee was assigned prior to being placed on the reemployment list. Where circumstances warrant, at the discretion of the Director, such reemployment list may be established by related classes whose duties are substantially similar to the class from which the employee was laid off.

80 Ill. Admin. Code § 302.570. The "Department" referenced in the first sentence is CMS. Gunville and Oakley assert that the provision quoted above, read with another section of the IAC, allows employees to qualify for appropriate jobs anywhere in the state:

> Whenever there is any person available on a reemployment list for recall to a vacant position for the same class, or related classes where such have been established pursuant to Section 302.570, agency and county or other designated geographical area, no temporary, provisional or probationary appointments shall be made to such vacancy.

80 Ill. Admin. Code § 302.580. The effect of these personnel rules together, Gunville and Oakley argue, is that an employee is entitled to be placed on reemployment lists not only for his last county of employment but on reemployment lists for any county in the state. They argue that prior Republican administrations interpreted the rules broadly to allow their reading of reemployment procedures. The Democratically-controlled governor's office, however, interpreted these provisions to place a laid-off employee only on the reemployment list for the single county designated as the work county on the employee's last job description. For Gunville, that interpretation was decisive: there were no prisons in his last county of employment because construction had been halted. Oakley also was unsuccessful in his quest for reemployment.

Gunville and Oakley concede that the IAC also grants the Director of CMS the discretion to interpret and apply the rules:

The Director of Central Management Services shall determine the proper interpretation and application of each rule of the Department of Central Management Services. The decision of the Director as to the proper interpretation or application of any such rule shall be final and binding upon all agencies and employees affected thereby unless or until modified or reversed by the Civil Service Commission or the courts. All agencies and employees shall comply with the Director's decision in the absence of a written opinion of the Attorney General or a written directive of the Civil Service Commission declaring the Director's decision to be unlawful.

80 Ill. Admin. Code § 304.110. They emphasize that the courts may modify or reverse a CMS Director's interpretation of the rules, but they neglect to cite the final sentence of the provision, obligating all agencies to follow the Director's reading of the rules unless the Attorney General or Civil Service Commission has issued a written directive declaring the Director's interpretation to be unlawful. Thus, IDOC officials were legally obliged to follow the CMS interpretation of the rules. That a court may modify or reverse the Director's reading of the IAC is irrelevant, in any event, in this case because the plaintiffs never asked a court to modify or reverse the Director's interpretation. Instead they complained that the Democratic administration rigged the system so that they would not be eligible for reemployment opportunities.

There are a number of problems with the plaintiffs' arguments. First, due process is not implicated when

government employees are laid off due to a reorganization. *Misek v. City of Chicago*, 783 F.2d 98, 100 (7th Cir. 1986). In *Misek*, we noted that some government employees have a property interest in their jobs and may be dismissed only in accordance with federal due process standards. 783 F.2d at 100. Due process generally requires notice and a meaningful opportunity to respond prior to termination. *Id*. But there is an exception to the right to a hearing when the discharge is caused by a reorganization. *Id*. Gunville and Oakley claim that any reorganization here was a sham, however, and that they are therefore still entitled to challenge their terminations. But the defendants have produced evidence that the terminations were the result of a reorganization of IDOC, and Gunville and Oakley have produced no admissible evidence to dispute the legitimacy of that reorganization. Therefore, under *Misek*, Gunville and Oakley had no right to a due process hearing prior to their terminations.

That said, it does not appear that Gunville and Oakley sought a hearing, and they do not seek a hearing on appeal. Rather, the crux of their due process claim is that the Democratically-controlled administration interpreted the personnel rules in a manner that excluded them from most opportunities for reemployment. They contend that the rules should have been given the same interpretation used under prior, Republican-controlled administrations. That brings us to the second major problem with the plaintiffs' claim. "[T]he due process clauses do not require hearings to resolve disputes

about the meaning and effect of laws, regulations, and contracts." *Goros v. County of Cook*, 489 F.3d 857, 859-60 (7th Cir. 2007). A plaintiff may not use a Section 1983 action "to determine whether some statute or contract creates a property interest in the abstract; unless the plaintiff maintains that the state actor had to offer a hearing to resolve some contested issue of fact, the dispute belongs in state court under state law." *Goros*, 489 F.3d at 860. As in *Goros*, the plaintiffs here have not raised a substantive due process claim because no fundamental right is at stake in the interpretation of the personnel rules. They are simply challenging the interpretation of state rules by state officials. Under *Goros*, a claim relating to the interpretation of the personnel rules does not belong in federal court.

To the extent that Gunville and Oakley argue that the personnel rules were rigged to exclude them from reemployment opportunities because of their political affiliation, that claim suffers the same deficiency as the argument on termination due to political affiliation. The plaintiffs have literally no evidence that political affiliation played a role in the decision to place laid-off employees on reemployment lists only for the last county of employment. There is no evidence that Gunville and Oakley or only Republican employees were singled out for this policy; it applied across the board to all employees who had been laid off. With no evidence of an improper motive in interpreting the personnel rules, the plaintiffs cannot sustain their claims. We have reviewed the plaintiffs' remaining claims and find no

merit in them. The district court was correct in granting judgment in favor of the defendants.

AFFIRMED.