In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2417

MARILYN L. TRASK-MORTON,

*Plaintiff-Appellant*,

*v.*

MOTEL 6 OPERATING L.P.,
a Delaware Limited Partnership,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 05 C 1633—**Larry J. McKinney**, *Judge.*

———————

ARGUED JANUARY 16, 2008—DECIDED JULY 17, 2008

———————

Before MANION, WOOD, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Shortly after midnight on December 7, 2003, Marilyn Trask-Morton checked into a Motel 6 in Indianapolis. Later that morning, Morton, acting dazed and confused, staggered into the lobby of the motel and up to the front desk, slid sideways, and fell to the floor. Morton was taken to a hospital, treated, and released. Morton has no memory of what happened between when she went to bed at the motel and when she regained consciousness in the hospital. Nevertheless,

Morton filed suit against Motel 6 Operating, L.P. alleging, among other things, that she had been sexually assaulted during that time and asserting several negligence claims against Motel 6 for allowing the assault to occur. Motel 6 filed a motion for summary judgment, which the district court granted. Morton appeals. We affirm.

I.

On Sunday, December 6, 2003, Morton drove a rental truck from Oklahoma, where she resided, to Indiana. She stopped at a Motel 6 on Bradbury Road in Indianapolis shortly after midnight on December 7. According to Morton, the reason for her trip was to help her friend Kirk Speelman of Las Vegas, Nevada, with his family's wholesale cigarette business. Morton testified at her deposition that she had agreed to drive an empty rental truck to Indianapolis for Speelman, who would be arriving by plane to meet her there. Speelman would then take the truck east to pick up supplies for his business, while Morton would fly back to Oklahoma. In exchange for her help, Morton testified that Speelman promised to pay her a thousand dollars in addition to reimbursing her expenses.

Upon arriving at the Motel 6, Morton checked in at the lobby. The front desk clerk on duty assigned Morton to Room 330, which was on the third floor. She also gave Morton a plastic key card and showed Morton where her room was located on a motel diagram.[1] Morton testified that she then parked the truck in the parking area close

---

[1] In an affidavit, the clerk stated that Morton was accompanied by a male when she arrived at the motel, but that the man did not accompany Morton to the check-in counter.

to her room and went up to her room. The room had sealed windows that would not open either from the inside or the outside. In addition, the room was not accessible through any of the other rooms in the motel. Morton used her key card to open the door to her room. A later check of the motel's electronic key-lock system showed that no key was used other than Morton's to enter the room that Sunday evening and the following morning.

Once inside the room, Morton locked the door and fastened the safety chain. After securing the door, Morton brushed her teeth at the sink outside the bathroom and the bathroom door, which was open. Morton did not use the bathroom, but did notice that the shower curtain "was about halfway over." The housekeeper who had cleaned Morton's room testified that her practice in cleaning a bathroom would be to put the shower curtain "in the middle" with the bath towel in front of it. Morton then took a dose of Flexeril, a muscle relaxant, and retired to bed in an undershirt and underpants. After a quick glance at the clock, which showed 12:57 a.m., Morton fell asleep. She has no memory of what occurred between when she fell asleep and when she regained consciousness in the hospital the following evening.

Tamara Belcher was tending the front desk of the motel the morning of December 7 when Morton staggered into the lobby. (The precise time of her entrance is unknown.) Morton was acting irrationally. Her speech was slurred, her appearance disheveled, and she appeared to be under the influence of drugs or alcohol. Morton made her way to the front desk, where she slid sideways and fell onto the floor. Belcher testified at her deposition that she asked Morton several times whether she should call an ambulance and that she understood Morton to answer "no." At some point,

another of the motel's guests (who also happened to be an emergency medical technician) checked Morton's pulse. He told Belcher that Morton's pulse was dangerously low and that she needed to be taken to the hospital. Belcher then called her supervisor and asked her if she could call an ambulance even though Morton had declined one. Belcher's supervisor responded "yes," and someone called an ambulance soon thereafter. An ambulance arrived five to ten minutes later and took Morton to the hospital. The ambulance report lists the time of the ambulance's dispatch as 10:57 a.m. and its arrival at the hotel as 11:05 a.m.

While Morton was in the lobby, her cell phone was ringing constantly. Belcher got hold of the phone and spoke with Speelman, who told her that he was on his way from the airport to the motel. Belcher testified at her deposition that Speelman arrived at the motel just as Morton was being taken out the door to the ambulance. According to Belcher, Morton called Speelman by name when he walked in the door and appeared to be happy to see him. The two then spoke briefly before Morton left in the ambulance for the hospital. Speelman paid for another night at the motel for Morton and was given a key to her room so he could take her personal belongings to her at the hospital.

Speelman, accompanied by a Motel 6 employee, went to Morton's room. Speelman testified at his deposition that when he arrived at the room, the door was ajar and Morton's personal effects were strewn about the room. Speelman said that he tidied up Morton's person belongings and then left for the hospital to check on Morton after finding the keys to the rental truck in the grass outside of the motel. Speelman later returned to the motel and found that the door to Morton's room was

still unlocked. After calling Morton's son to notify him of her condition, Speelman took the rental truck and left Indianapolis.

Morton did not regain consciousness until sometime Monday evening. She recalls someone from the hospital staff shaking her and telling her that they needed to do a spinal tap, which she declined. Morton testified that when she "came to" she was wearing her undershirt, shoes, and a pair of unbuttoned and unzipped jeans, but no socks or underwear. The medical records from the hospital visit noted that Morton's temperature was 95.5° Fahrenheit; she was confused, disoriented, and slurred her speech; she complained of pains and aches all over her body, including her knees, ankles, and calves; she was assessed for multiple sclerosis; and a CT scan of her head was "negative." There was no mention in the records of Morton's emergency-room visit of any sexual assault. Nor was there any suggestion that Morton was being treated as a victim of a sexual assault.

Morton took a taxi back to the motel and returned to her room, with the taxi driver accompanying her to obtain payment. According to Morton, when she reached her room she found that her purse was gone, her cell phone missing, and her luggage ransacked. Morton was not able to pay the driver, but took his business card and promised to pay him when she got some money.[2] Morton spoke with her son late that evening over the phone about wiring her cash. Morton testified that during the conversation she told him she had been attacked. Morton

_____

[2] Morton stated that she later paid and tipped the driver after she received money wired from her son.

stated that she did not remember if she used the restroom when she returned to her room, but she did know that she did not take a shower. Morton stayed the night in her room.

The next day, Morton had the front desk contact the police twice. The first time, Morton had the police summoned to report the theft of her property. Upon their arrival, Morton told the officers she had awoken around 8:00 a.m. on December 7 after dreaming that she was falling and, though dizzy, was able to walk down to the front desk. She explained to the officers that she discovered that her purse was missing when she returned from the hospital. She also told them that she did not believe she had been sexually assaulted. After speaking with the officers and returning to her room, Morton testified that she ran back downstairs and told the police about a bump on her head.

Morton contacted the police a second time because, after again returning to her room, she noticed several things in the room that caused her concern: her underwear was missing from her suitcase, a sports magazine was on the floor in the bathroom, and it appeared as if someone had used her make-up and the towels in the bathroom. The police returned that afternoon. Morton told the officers that she believed she had been sexually assaulted, and they took Morton back to the hospital for further evaluation. A physical examination revealed swelling on Morton's forehead, "generalized redness" to her cervix, and a few bruises on her arms and lower legs. The examination report also noted that Morton complained of pain to her groin.

Morton filed suit against Motel 6 in the United States District Court for the Northern District of Oklahoma on August 22, 2005. In her complaint, she alleged that

she was brutally assaulted, robbed, and raped. She brought several claims of negligence against Motel 6, asserting, among other things, that Motel 6 was negligent for failing to provide adequate security and for failing to render aid. The case was transferred to the Southern District of Indiana, and Motel 6 moved for summary judgment. Morton responded to Motel 6's motion and, at the same time, filed a motion for sanctions asserting that Motel 6 engaged in bad faith discovery practices and the destruction of evidence. The district court denied Morton's motion for sanctions and granted summary judgment in favor of Motel 6 on all of Morton's claims except those relating to the loss of her property.[3] In its opinion, the district court found that Morton's claims of negligence arising from the alleged sexual assault failed as a matter of law because Morton had failed to present sufficient evidence to create a triable issue of fact on the issue of proximate causation. The district court stated that there was not enough evidence on the record for a reasonable jury to conclude that Morton was sexually assaulted in the early morning of December 7. Without facts to support Morton's allegation that an assault occurred in the first place, the district court reasoned, Morton could not connect the injuries she alleged occurred as the result of the assault to any breach of duty by Motel 6. Morton appeals.

---

[3] Both parties later agreed to the dismissal of Morton's claims relating to the loss of her property, and the district court entered final judgment.

## II.

On appeal, Morton challenges the district court's grant of Motel 6's motion for summary judgment and its denial of her motion for sanctions. With respect to the district court's decision on Motel 6's motion for summary judgment, Morton argues that the district court erred by failing to view the evidence in the light most favorable to her and also by resolving disputed issues of fact. According to Morton, had the district court viewed the evidence properly, it would have found that she produced enough evidence for a jury to conclude that Motel 6's negligence caused her injuries.

We review a district court's grant of summary judgment de novo to determine whether there exists a genuine issue of material fact, construing all facts and inferences in the light most favorable to Morton, the party opposing summary judgment. *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing 'that there is an absence of evidence to support the nonmoving party's case.'" *Chelios*, 520 F.3d at 685 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). To successfully oppose a motion for summary judgment, the nonmoving party must come forward with specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party must show that there is

evidence upon which a jury reasonably could find for him; that requirement is not met by producing only a "mere scintilla" of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Because this is a diversity case, we apply the substantive law of the forum state, Indiana. *Lummis v. State Farm Fire & Cas. Co.*, 469 F.3d 1098, 1100 (7th Cir. 2006). To get her negligence claims before the jury, Morton needed to present evidence from which a reasonable jury could have concluded that (1) Motel 6 owed a duty to her, (2) it breached that duty; and (3) Morton's injuries were proximately caused by the breach. *See Benton v. City of Oakland City*, 721 N.E.2d 224, 232 (Ind. 1999). The district court found that Morton had failed to produce sufficient evidence to support a reasonable jury finding in her favor on the third element, proximate causation. Under Indiana law, "proximate cause" has two aspects: (1) whether the injury would not have occurred without the defendant's negligent act or omission (also referred to as "causation in fact"); and (2) whether the injury "is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated." *City of Gary v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1243-44 (Ind. 2003) (quoting *Bader v. Johnson*, 732 N.E.2d 1212, 1218 (Ind. 2000)). Although both of those inquiries are ordinarily for the jury, "where it is clear that the injury was not foreseeable under the circumstances and that the imposition of liability upon the original negligent actor would not be justified, the determination of proximate cause may be made as a matter of law." *Arnold v. F.J. Hab, Inc.*, 745 N.E.2d 912, 917 (Ind. Ct. App. 2001) (quoting *Collins v. J.A. House, Inc.*, 705 N.E.2d 568, 573 (Ind. Ct. App. 1999)).

This is a case where the court properly determined the issue of probable cause as a matter of law. Crucial to all of Morton's negligence claims against Motel 6—save her claim for failing to render aid, which we will discuss separately below—is her assertion that she was sexually assaulted in her room during the early morning hours of Monday, December 7, 2003, and Motel 6 somehow was responsible for the assault. Morton has produced copious amounts of evidence showing that a great deal of crime was committed at the Motel 6 where she stayed. She also has expended great efforts to show that the security at the motel was inadequate. But before a jury could find Motel 6 liable from that evidence, there first would have to be sufficient evidence for a jury to conclude both that Morton was attacked and that Motel 6's security failings were somehow related to the manner in which the attack occurred.

The key deficiency in Morton's case, however, is the complete lack of evidence connecting her generalized evidence of high crime and shoddy security at the motel to the sexual assault she alleges occurred in her room. Under Indiana law, "[n]egligence will not be inferred; rather, specific factual evidence, or reasonable inferences that might be drawn therefrom, on each element must be designated to the trial court." *Hayden v. Paragon Steakhouse*, 731 N.E.2d 456, 458 (Ind. Ct. App. 2000) (emphasis omitted). "[A]n inference is not reasonable when it rests on no more than speculation or conjecture." *Id.*; *see also Collins v. Am. Optometric Ass'n*, 693 F.2d 636, 640 (7th Cir. 1982) (applying Indiana law) ("[A] jury's determination of proximate cause must be based upon provable facts and cannot be based upon mere guess, conjecture, surmise, possibility or speculation.") (internal quotation

marks omitted). Here, there is simply not enough evidence in the record for a jury to find that an attack on Morton occurred in a manner for which Motel 6 would be responsible without resorting to speculation.

Central to that lack of evidence is the fact that Morton does not remember anything from the time she fell asleep around 1:00 a.m. on Monday, December 7 until the time she regained consciousness at the hospital later that evening. That Morton has no memory in and of itself is not necessarily fatal to her claims. One can easily imagine a situation where the victim has no memory of an assault, yet sufficient circumstantial evidence exists to conclude both that the victim was attacked and that the manner in which the assailant perpetrated the assault was related to the hotel's breach of its duty to the victim. *Fund v. Hotel Lenox of Boston, Inc.*, 635 N.E.2d 1189 (Mass. 1994), involving a claim for wrongful death, is an example of such a case. In *Fund*, the decedent was murdered. There were no witnesses to the circumstances surrounding her attack. However, there was no question that she was attacked— she was robbed and stabbed to death. The attack occurred in her room, where her body was found. *Fund*, 635 N.E.2d at 1190, 1191. Furthermore, the decedent's room was near the fire escape, a known access point for those committing crimes in the rooms of the hotel. Thus, the court in *Fund* concluded that a reasonable jury could find in favor of the plaintiff based upon the hotel's security failings. *Id.*; *cf. Mitchell v. Pearson Enterprises*, 697 P.2d 240, 245-46 (Utah 1985) (finding that plaintiff had failed to establish proximate causation as a matter of law where there was no evidence concerning the assailant's identity or how he may have entered the decedent's room).

Unlike *Fund*, Morton's lack of memory is coupled with a complete dearth of circumstantial evidence. When

Morton arrived at her room the first night she stayed there, Morton did not notice anyone in the room or anything unusual about the room. Morton testified that she locked the door and fastened the safety chain when she entered the room, and a subsequent examination of the key card system showed that no one else entered the room with a key after Morton. The room had windows that were sealed shut and no other access doors besides the door Morton entered. There was no evidence of any forced entry after Morton entered the room. Morton herself testified that she did not know how a person could have come into her room with the safety chain attached.

Given that Morton saw no one else in the room when she arrived, and offers no explanation for how someone entered the room after she locked the door, the only possible theory of how a sexual assault occurred is that someone was hiding in the room before Morton entered, and that person then came out of hiding and assaulted her while she slept. *Cf. Fortney v. Hotel Rancroft*, 125 N.E.2d 544, 546-47 (Ill. App. Ct. 1955). The court in *Fortney* held that the hotel's negligence was a jury question where evidence indicated that an intruder was in the room when the plaintiff arrived. Key to the holding in *Fortney* was the fact that the assault victim was later found by hotel staff in the room, bloody and unconscious.

In this case, however, a jury could not find that Morton was sexually assaulted on a hidden attacker theory without resorting to impermissible speculation. Morton testified at her deposition that the only place the supposed assailant could have been hiding was behind the shower curtain. Yet Morton did not testify that she noticed anything that would have been indicative of someone hiding behind the shower curtain. Instead, she

could only speculate at her deposition that there might have been someone behind the shower curtain when she arrived in the room:

Q. Okay. So you think that when you checked into the room that there may have been a person in the bathtub behind the shower curtain?

A. It could have happened.

Q. Well, I—are you claiming that's what happened?

A. No, I'm not going to claim anything.

Q. Okay.

A. I don't remember what happened.

If Morton, who was in the room, has to resort to conjecture in order to place an attacker behind the shower curtain, a jury certainly would have to do likewise.

Nevertheless, Morton tries to rescue this hidden attacker theory by pointing to the "inconsistency" between the housekeeper's usual placement of the shower curtain and where she saw the shower curtain that night. The housekeeper's practice was to put the shower curtain "in the middle," while Morton said she noticed that the shower curtain "was about halfway over." Those statements seem compatible. Yet even if a reasonable jury could find that those accounts are inconsistent, Morton would only be marginally closer to her goal of proving that someone was hiding behind the shower curtain. Morton is in need of more circumstantial evidence before a reasonable jury could accept that theory, and the evidence simply is not there.

While the record is littered with unusual facts, those facts do not add up to a sexual assault. The various wit-

nesses who saw Morton in the lobby that morning agreed that she was having serious problems, but the apparent cause was either alcohol or drugs. There is no mention of any sexual assault, or any injuries consistent with an assault, in the hospital records for Morton's first visit to the hospital on December 7. Nor do the hospital records for her December 7 hospital visit indicate that Morton was being treated as a victim of a sexual assault. The December 8 physical examination on her second visit to the hospital revealed some bumps and bruises, as well as "generalized redness" to her cervix. But Morton has not provided any medical evidence establishing that "generalized redness to the cervix" is indicative of sexual activity, much less allegations of a brutal sexual assault. And given Morton's complete lack of memory during and after the time in question, a jury could just as easily conjecture many other, more likely, causes for the bumps and bruises than a sexual assault—such as Morton's fall while discombobulated in the lobby.

Morton points to other evidence in an attempt to establish an assault occurred, such as her testimony that she went to bed in her underwear and woke up in the hospital with no underwear and her jeans unzipped, and that she observed on December 8—the day after the assault—that someone had used her make-up, her underwear was missing from her suitcase, a sports magazine was on the floor in the bathroom, and the towels in the bathroom had been used. The evidence indicates that Morton's room remained unlocked (possibly with the door ajar) during her first visit to the hospital. Anyone could have been in her room while she was gone. Thus, absent other evidence not in the record, such as medical evidence of a sexual assault or testimony from Morton that she saw her assailant in the room, a reasonable jury

could not conclude that Morton was sexually assaulted. *Cf. Margreiter v. New Hotel Monteleone, Inc.*, 640 F.2d 508, 509 (5th Cir. 1981) (upholding jury finding of negligence where evidence showed that assailants entered the plaintiff's room with a key and kidnapped him). Again, the main evidentiary problem here is that Morton does not remember anything from that night after she fell asleep.

Moreover, even if a reasonable jury could find that Morton was sexually assaulted, there is no evidence that such an assault occurred under circumstances where Motel 6 should be held at fault. In cases deciding whether a hotel should be liable for attacks perpetrated by third parties, courts have found the circumstances surrounding the assault determinative of liability. *Compare McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554, 1560 (7th Cir. 1987) (upholding jury verdict for defendant hotel where evidence showed that plaintiff left the door unlocked, allowing someone to enter and attack her), *Wassell v. Adams*, 865 F.2d 849, 855-56 (7th Cir. 1989) (upholding jury verdict favorable to the defendant where plaintiff opened the door for her assailant and allowed him to enter the room), *and Mitchell*, 697 P.2d at 245-46, *with Margreiter*, 640 F.2d at 509, *and Fund*, 635 N.E.2d at 1190-91. But here we do not know *any* of the circumstances surrounding the alleged assault. Did Morton, in her confusion, open the door for an assailant? We do not know, and a jury could only speculate. Although Morton does not remember it, at some point she must have left her room, or else she would not have ended up in the lobby. Where did she go? What happened to her while she was out of her room? Again, we can only guess. Because of these and other unanswerable questions, the district court was correct in concluding that Morton had failed

to present sufficient evidence to create a triable issue of fact on the issue of proximate causation.

As mentioned above, Morton's failure to produce sufficient evidence from which a reasonable jury could hold Motel 6 liable for the alleged sexual assault does not necessarily doom Morton's other claim that Motel 6 was negligent because it failed to render timely aid to Morton after she stumbled into the motel lobby that morning. Nevertheless, the district court correctly granted summary judgment on that claim as well. Under Indiana law, an innkeeper owes a duty to his guests to render aid after he knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others. *See Baker v. Fenneman & Brown Properties, LLC*, 793 N.E.2d 1203, 1207 (Ind. Ct. App. 2003). Morton argues that she has created a genuine issue of material fact as to whether Motel 6 breached that duty. Specifically, Morton argues that there is a factual dispute as to how long Morton was in the lobby. Morton testified that Belcher first told her that she entered the lobby about 8:00 a.m.[4] The ambulance report states that the ambulance was not dispatched until 10:57 a.m. Regardless of how long Morton was in the lobby, however, Morton's claim fails because she has not offered any evidence that the delay in the arrival of the ambulance caused her any injury. *See Bader*, 732 N.E.2d at 1218. Summary judgment on Morton's failure-to-aid claim was therefore proper.

We now turn to the district court's denial of Morton's motion for sanctions. We review the district court's deci-

---

[4] Morton also testified that Belcher later changed her story and told Morton that she saw Morton arrive in the lobby "four to six-ish." Belcher did not come on duty, however, until 6:57 a.m.

sion to refrain from imposing discovery sanctions for an abuse of discretion. *Park v. City of Chicago*, 297 F.3d 606, 614 (7th Cir. 2002). Morton puts forth two grounds upon which she argues the district court should have sanctioned Motel 6. First, Morton asserts that Motel 6 should have been sanctioned for the destruction of internal documents and electronic data dating back to December of 2003, such as the back–up tapes containing emails or other electronic data relating to the claims in Morton's complaint as well as any security logs and reports. Morton has made no showing, however, that Motel 6's destruction of any of those materials was done in bad faith. Such a showing is a prerequisite to imposing sanctions for the destruction of evidence. *See Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001); *see also Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998) ("That the documents were destroyed *intentionally* no one can doubt, but 'bad faith' means destruction for the purpose of hiding adverse information."). Furthermore, courts have found a spoliation sanction to be proper only where a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent. *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007); *see also Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001). In this case, Motel 6 had no reason to suspect litigation until—at the earliest—Morton's attorney sent Motel 6 a demand letter in May 2005. Shortly after the incident, Motel 6 hired Monarch Investigations, Inc. to investigate what happened. As the district court noted, the report from that investigation is highly detrimental to Morton's case. It contains numerous contradictory accounts

of the incident that Morton relayed to the motel's staff.[5] In addition, the report detailed the lack of evidence supporting Morton's claim that she was sexually assaulted in her room. Thus, Motel 6 had no reason to anticipate litigation, and thus no duty to preserve anything, until May 2005. Because Morton has not shown that Motel 6 violated its duty by destroying anything after that date, the district court did not abuse its discretion in denying sanctions.

As her second ground justifying the issuance of sanctions, Morton contends that Motel 6 acted in bad faith during discovery by misrepresenting the existence of back-up tapes and emails.[6] In a request for production, Morton asked for "[b]ackup tapes containing email and other electronic data related to the allegations in the Complaint or the Claims for Relief in this action." To that request, Motel 6 responded, "None." Morton contends that Motel 6's response was an intentional misrepresentation

---

[5] For instance, the report contained a statement by Motel 6's housekeeper that Morton had told her that she believed she was injected with an unknown drug while she was in the motel lobby by a white male who was wearing a black leather jacket and who talked with a New York accent. The report also contained Belcher's statement that Morton told her that "both [Morton] and her son had a dream of her being raped [and that she] does not believe that was just a coincidence, but that it [the rape] actually happened."

[6] Morton also included a bullet-point list of other alleged discovery abuses in her opening brief. [Blue br. at 60] Because Morton does not flesh out any of those allegations, we need not address them. *See United States v. Dabney*, 498 F.3d 455, 460 (7th Cir. 2007) (noting that arguments not developed in the opening brief are waived).

because Morton later found out that, although all back-up tapes prior to December 2004 had been destroyed, Motel 6 had back-up tapes for December 2004, February 2005, April to December 2005, and January to October 2006.

We do not see how the existence of those tapes demonstrates that Motel 6 intentionally misrepresented anything. Morton did not ask if *any* back-up tapes existed; she asked for back-up tapes containing electronic data *related to the allegations in the complaint*. The events described in the complaint took place in December 2003, not December 2004. It is undisputed that the back-up tapes for December 2003 and January 2004, the tapes that may have contained electronic data relevant to the allegations in Morton's complaint, were destroyed. While it is conceivable that the later tapes *might have* contained information related to Morton's claims, we can only speculate on this record. There is simply no evidence that Motel 6's answer "None" to the question concerning the tapes was an intentional misrepresentation. Thus, we see no abuse of discretion in the district court's refusal to sanction Motel 6 on that point.

We also find no abuse of discretion in the district court's failure to sanction Motel 6 regarding the production of emails relevant to the allegations in Morton's complaint. After searching its paper files for email printouts, Motel 6 believed that it had done all that was required of it to search for and retrieve emails pertaining to Morton's case. Morton disagreed, and took the dispute before the magistrate judge assigned to the case. The magistrate judge ruled that Motel 6 had not satisfied its obligation to search for responsive emails and would have to make a global search of its computer system for emails or, if a global search was not practical, a search of the computers

of employees who were reasonably likely to have sent or received relevant emails. Morton does not claim that Motel 6 failed to abide by that ruling. Thus, we cannot say that the district court abused its discretion by failing to sanction Motel 6 for its conduct relating to the disclosure of emails pertaining to Morton's case.

## III.

The circumstances surrounding Morton's stay at Motel 6 on December 7, 2003, were beyond strange. But bizarre facts, by themselves, do not add up to foul play, much less liability. Viewing the evidence in the light most favorable to Morton, a reasonable jury could not have concluded that any negligence on the part of Motel 6 caused Morton's alleged injuries without resorting to impermissible speculation. The district court therefore properly granted summary judgment in favor of Motel 6 on Morton's claims of negligence relating to the alleged sexual assault. In addition, the district court did not abuse its discretion in denying Morton's motion for sanctions. We AFFIRM.