In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2994

JAMES BLASIUS,

*Plaintiff-Appellant*,

*v.*

ANGEL AUTOMOTIVE, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 13-CV-00046-JVB-CAN — **Joseph S. Van Bokkelen,** *Judge*.

ARGUED FEBRUARY 19, 2016 — DECIDED OCTOBER 12, 2016

Before MANION and ROVNER, *Circuit Judges,* and BLAKEY, *District Judge*.[*]

BLAKEY, *District Judge*. In July 2009, Appellant James Blasius purchased a used 2005 Ford Excursion. In June 2012, Blasius entrusted Appellee Angel Automotive, Inc. ("AAI") with upgrading the vehicle to make it "safe" and "reliable."

---

[*] Of the Northern District of Illinois, sitting by designation.

Blasius alleges that AAI negligently betrayed that trust when, one day and about 200 miles after pick up, the vehicle caught fire and was destroyed. The district court granted summary judgment for AAI after concluding that: (1) Blasius failed to present evidence that AAI's work proximately caused the fire; and (2) the doctrine of *res ipsa loquitur* did not apply. Blasius appealed. For the reasons explained below, the decision of the district court is REVERSED.

## Background & Procedural History

In July 2009, Blasius, a resident of Michigan, purchased a used 2005 Ford Excursion for towing his motorcycle racing trailer. Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 1; Blasius Dep. 19:1–7. Over the next three years, Blasius invested in approximately $70,000 worth of parts, accessories, and modifications to the vehicle.[1] Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 4.

In the summer of 2012, Blasius next contacted AAI, an automotive repair shop located in Elkhart, Indiana, to further improve the Excursion's performance. Blasius outlined several components he wanted inspected and improved and gave AAI an "open checkbook" for the repairs. Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 8; Blasius Dep. 37:19–22. These components included, among others, the vehicle's engine, suspension, turbocharger, intake and exhaust manifolds, exhaust, transmission, brakes, spark plugs, and oil pump. Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 8.

---

[1] These improvements included, among others, a new sound system, tires, suspension, fuel system, batteries, transmission, and turbocharger. Blasius Dep. 15:1–36:25. These initial modifications were completed by the end of May 2012. Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 8.

AAI not only agreed to Blasius' requests, but also "gave the truck a complete once-over" and recommended additional modifications, which Blasius approved. Angel Dep. 14:2–3, 44:11–15.

In June 2012, AAI mechanics Thomas Angel and Daniel Fine performed the desired work. *Id*. at 11:10–13; Fine Dep. 62:20–22. Due to the extent of Blasius' requested modifications, AAI first removed the Excursion's body from its chassis. Angel Dep. 14:2–22; Fine Dep. 43:14–15. This process involved disconnecting (and eventually reconnecting) the vehicle's various fluid transfer lines, including coolant lines, brake lines, and power steering hoses. Angel Dep. 15:11–15.

After removing the vehicle body, AAI's overhaul included replacing the Excursion's fuel pump, auxiliary fuel filter, and fuel lines. *Id*. at 19:6–9, 19:23–20:3, 27:2–4, 43:11–20; Fine Dep. 23:18–20, 29:6–11, 36:22–37:2, 39:20–40:5. The new fuel lines ran from the fuel tank at the rear of the vehicle to the newly installed fuel pump, to an auxiliary fuel filter, and then finally to the topside of the driver's side of the engine. Angel Dep. 22:9–23:20. A return line was run out of the engine back to the fuel tank. *Id*. at 24:1–6.

AAI originally promised to complete work by Thursday, June 21, 2012. *Id*. at 44:20–46:2; Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 12. On June 20, 2012, however, AAI informed Blasius that the Excursion was not ready for pick up. Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 12. Aware that Blasius desired to take the truck on an upcoming trip to northern Michigan, Angel promised Blasius that the vehicle would be available the following Thursday, June 28, 2012. Angel Dep. 45:1–3, 47:3–10. At his deposition, Angel testified that these circumstances created a "heightened sense of ur-

gency" within AAI to complete the repairs. *Id*. at 48:9–16. Angel testified that, by the time AAI finished working on the Excursion, there was little additional work that could have been done to the vehicle. *Id*. at 46:24–47:2.

On June 28, 2012, Blasius picked up his Excursion and drove approximately 200 miles back to his Michigan home.[2] *Id.* at 48:17–19; Blasius Dep. 44:17–19. Upon arrival, Blasius emailed AAI and complained of new or persisting issues with the vehicle's performance. Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 13. Blasius described "limited pull off the line," heavy exhaust smoke, and a "rattling or pinging or knocking" at low rpm's. Angel responded on the morning of June 29, 2012 and promised to resolve the issues, but did not discourage Blasius from driving the truck in the interim. *Id.*; Angel Dep. 51:12–18.

Later on June 29, 2012, Blasius left his home in the Excursion with his motorcycle trailer in tow. Blasius Dep. 46:12–21. Blasius' adult son and his son's friend were passengers. *Id*. at 5:13–17. At his deposition, Blasius testified that, after traveling approximately 12 miles, Blasius' son observed smoke emanating from the vehicle's interior vents. *Id*. at 47:1–7. As a result, after approximately 30 seconds, Blasius began to pull over to the shoulder. *Id*. at 47:15–17. As Blasius looked in his review mirror, he observed additional smoke behind the vehicle. *Id*. at 47:18–23. Blasius also discovered that his parking, emergency, and trailer brakes were non-responsive. *Id*. at 48:6–49:15. Smoke billowed into the vehicle

---

[2] Angel testified that, prior to transferring the Excursion back to Blasius, he and Fine also test drove the vehicle. Angel Dep. 47:15–25.

cabin as Blasius swerved on and off the shoulder in an attempt to slow the vehicle. *Id*. at 49:16–23.

The Excursion eventually came to a stop after approximately three-quarters of a mile. *Id*. at 50:1–3. After escaping the vehicle, Blasius specifically observed burning diesel fuel running along the bottom and sides of the vehicle. *Id*. at 50:14–52:1. Blasius unsuccessfully attempted to subdue the fire with multiple fire extinguishers. *Id*. at 52:23–55:14. Sadly, by the time firefighters arrived, the vehicle was destroyed and the motorcycle trailer was damaged. *Id*. at 68:13–14; Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 14.

After the fire was finally extinguished, the Excursion was loaded onto a flatbed wrecker and taken to a nearby storage facility. Blasius Dep. 66:3–6. When Blasius notified Angel of the situation, Angel admitted to Blasius that he believed a fuel leak may have caused the fire. *Id*. at 55:1–5.

Shortly thereafter, James Raad, a certified vehicle fire investigator, conducted an inspection of the vehicle remnants. Raad Aff. 1. Raad determined that the fire originated under the vehicle, but could not ascertain conclusive evidence of its exact cause. *Id*.

On January 22, 2013, Blasius filed suit against AAI in the Northern District of Indiana for negligence and breach of contract. Compl., ECF No. 1. In July 2013, Blasius' own expert, Adam Hooker, inspected the disassembled remains of the vehicle, and rendered various conclusions about the cause of the fire. Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 11 at 1. Among the conclusions in his report, Hooker found that the diesel and brake fluid systems (worked on during AAI's overhaul) were "more likely related to the

cause of the fire" and the "diesel fuel or brake fluid" was the "first fuel(s) ignited during the progression of the fire." *Id*.

On March 4, 2015, the district court granted AAI's motion for summary judgment. Op. and Order, ECF No. 68. In its ruling, the court found that Blasius "failed to present evidence showing that [AAI's] modification to the [Excursion] caused the fire." *Id*. at 5. Additionally, the court held that the doctrine of *res ipsa loquitur* did not apply. *Id*. at 6–7. Blasius challenges both aspects of the district court's ruling.

## Discussion

We review the district court's grant of summary judgment de novo. *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In making this determination, we view all evidence in the light most favorable to, and derive all reasonable inferences in favor of, the nonmoving party. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). Summary judgment is warranted only if, after doing so, we determine that no jury could reasonably find in the nonmoving party's favor. *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016).

### A.      Proximate Cause

Under Indiana law, proximate cause "is an essential element of a negligence action." *Carson v. ALL Erection & Crane Rental Corp.*, 811 F.3d 993, 998 (7th Cir. 2016) (quoting *Hassan v. Begley*, 836 N.E.2d 303, 307 (Ind. Ct. App. 2005)).

> Proximate cause in Indiana negligence law has two aspects. The first—causation in fact—is a

> factual inquiry for the jury. If the injury would not have occurred without the defendant's negligent act or omission, there is causation in fact. A second component of proximate cause is the scope of liability. That issue, which is also for the trier of fact, turns largely on whether the injury is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated. Under this doctrine, liability may not be imposed on an original negligent actor who sets into motion a chain of events if the ultimate injury was not reasonably foreseeable as the natural and probable consequence of the act or omission.

*City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1243–44 (Ind. 2003) (internal citations and quotations omitted). Proximate cause "must be based upon provable facts and cannot be based upon mere guess, conjecture, surmise, possibility or speculation." *Collins v. Am. Optometric Ass'n*, 693 F.2d 636, 640 (7th Cir. 1982). In other words, the factual evidence supplied must reflect some "reasonable certainty or probability." *Mr. Bults, Inc. v. Orlando*, 990 N.E.2d 1, 5 (Ind. Ct. App. 2013).

In support of its summary judgment ruling, the district court cited the "dearth of evidence" connecting Blasius' vehicle fire with AAI's repair work, and stated that "[h]ypothesis alone is not enough to subject [AAI] to liability." Op. and Order 5, ECF No. 68. Our review of the record, however, demands a different conclusion.

Hooker's written report—which accompanied Blasius' response to AAI's summary judgment motion—noted the "extent of the disassembly work that Angel Automotive had to perform in order to install various upgraded components and to replace the fuel lines." Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 11 at 1. According to Hooker, to achieve this requisite level of disassembly, numerous connections "had to be disconnected and reconnected." *Id*. Hooker's observations were confirmed by both Angel and Fine. Angel Dep. 14:2–22, 15:11–15; Fine Dep. 43:14–15. Hooker further noted that these connections "were located within numerous fluid moving systems within the vehicle" and that the fluids contained therein—diesel fuel, power steering fluid, brake fluid, motor oil, window washer fluid, and anti-freeze—"can all be ignited via hot engine and exhaust components." Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 11 at 1.

Hooker opined that these fluid systems "were all interacted with during the process of Angel Automotive completing their work," and that the misalignment, forcing, crossthreading, over torqueing, or under torqueing of any fluid system connections "could lead to a leak that under the proper conditions … would produce a fire." *Id*. Hooker concluded that, absent "documentation that the proper torque values were applied to all connections within the vehicle, the potential of a leak in one of these systems cannot be eliminated as a possible cause of this fire." *Id*. at 2.

Hooker's report further concluded that the fire originated "in an area that encompasses the left rear portion of the engine compartment, the bulkhead area, and the area in between the transmission and the left side body and door panels." *Id*. at 2. The report highlighted that "the fuel lines lead-

ing from the fuel tank to the fuel injection pump are located in this area," as are the "brake system master cylinder and reservoir"—all of which were "manipulated and/or removed and reinstalled" during AAI's work on the vehicle. *Id*. According to Hooker, as noted above, these systems were "more likely related to the cause of the fire" and "diesel fuel or brake fluid" was the "first fuel(s) ignited during the progression of the fire." *Id*.

The district court's ruling failed to address any portion of this written report. Instead, the court highlighted a selective, two-page portion of Hooker's 59-page deposition transcript in which Hooker did not pronounce, in response to certain questions, that the fire was "more likely than not" caused by AAI's repair work. Op. and Order 5, ECF No. 68. This under-inclusive analysis misconstrues Hooker's overall assessment.

A comprehensive reading of Hooker's deposition, on the other hand, confirms that, time and again, his testimony reinforced the expert opinions set forth in his written report. During questioning, Hooker maintained that a fluid system leak constituted the "most likely scenario" for the June 29, 2012 fire. Hooker Dep. 45:13–46:1. He further agreed that "[b]ut for the removal and the manipulation and disassembly" of fluid transfer lines by AAI, the fire would not have occurred. *Id*. at 53:24–54:3.

Admittedly, Hooker also noted some limits to his overall assessment. Hooker acknowledged, for example, that due to the delayed nature of his examination, he did not possess *definitive* proof of causation:

> Q. In your expert opinion, what caused this fire?

A. I feel that this fire was caused by a possible leak in the fluid system that came in contact with a heated portion of the exhaust system.

Q. So is it your testimony that you were able to determine a cause of this fire?

A. No, I was not. I have no *proof* of that and that's why I did not.

Q. So it is not your expert opinion that the fire was caused by a leak in the fluid system?

A. I feel it's potentially caused by that, but I don't *know* that because I didn't see any of this for myself.

…

Q. I'm just trying to determine whether or not your report is just listing a possible cause of the fire or it's your expert opinion based on your experience that this is the cause of the fire in your opinion.

A. This is my opinion of what potentially may have taken place. I don't *know* what took place and I don't *know* what it looked like because there was nothing for me to really look at. Does that, does that help?

Q. Yeah, I believe so. So just so we're clear, you believe that it is possible that a fuel leak caused the fire but you were unable to determine whether or not that actually occurred in this case.

A. I believe a fluid leak, not a fuel. A fluid leak. One of them.

Q. Possibly caused the fire.

A. Correct.

Hooker Dep. 45:13–46:1, 46:14–47:4 (emphasis added). Upon further questioning, however, Hooker clarified both the scope and basis of his position:

Q. Is it fair to say that something that Angel did was not done properly to cause this fire?

A. That's my, that's my thoughts on this, is that some of the work that Angel did led to this event taking place.

Q. "This event" being the fire.

A. Yes.

Q. But because you didn't have an opportunity to actually inspect the vehicle intact, you can't say *100 percent* what it was.

A. No.

Q. So what, what would you say your opinion is as to the cause of the fire in this case?

A. My, my opinion of what may have caused this is a leak in one of the fluid systems that were involved in Angel Automotive's disassembly, replacement, and reassembly of those fluid moving systems causing a leak. Not causing a leak; having a leak. And finding an ignition source within that vehicle. My, my [sic] thought is is [sic] that there's a portion of the

exhaust that I saw in one of, those are Angel Automotive's photos I think, of the work done that shows a portion of the exhaust that wasn't insulated? So that, also coupled with what kind of damage I could see on some of Mr. Raad's photos kind of, of [sic] gave me that very broad area where I felt the fire may have come from.

Q. Is it true in speaking with Mr. Blasius that he told you he saw diesel fuel leaking from the engine?

A. Yes, and that also—I should have said that. And also that Mr. Blasius' conversation with me, it also plays to leading me back into that area which helps me find kind of increased damage in that area, plus that one portion of exposed exhaust system in there.

Q. So just to be clear, is it your opinion that if diesel fuel or one of the other liquids, whether it be coolant or brake fluid or oil, if one of those fluids leaked … that those fluids could be ignited by the exhaust, the exposed exhaust?

A. Yes, I think that is possible.

Q. And is it your opinion that that is more than likely what occurred in this case?

A. *Yes, that's my most likely thought on what led this fire to happen.*

> Q. If Angel had not done the work on this ve-
> hicle that it did, do you believe that this vehicle
> would have caught fire as it did where it did?
>
> …
>
> A. Yeah, I don't *know* that but it, in the chain of
> events it, with all of that stuff being manipulat-
> ed by them and then shortly after this fire tak-
> ing place, when I look at that as a whole, yes. *I
> think that if that work hadn't had been done, this
> exact thing probably would not have happened*.

Hooker Dep. 53:24–56:4 (emphasis added).

When Hooker's deposition testimony is considered in its
entirety, his reluctance to use the exact phrase "more likely
than not" better reflects confusion regarding the adverse
questioning (and the legal nuance of burdens of proof) ra-
ther than any meaningful hesitancy on the reasonable prob-
ability of causation:

> Q. So in your opinion is it more likely than not
> that Angel Automotive's work caused the sub-
> ject fire?
>
> A. I think it's possible, yes.
>
> Q. So your testimony is it's possible that they
> were the cause of the subject fire, not that it's
> more likely than not. Is that correct?
>
> A. I didn't understand that question. Is it pos-
> sible versus more likely than not? What's the
> difference?
>
> Q. Possible means it's a possibility.

A. It absolutely is a possibility.

Q. And that's your testimony. It's a possibility. Or is it more likely than not the cause?

…

A. I, I don't see—I'm struggling with the two. They kind of seem very close to me. "More likely than not" is a "possibility." I don't, I don't understand the question, I guess. I absolutely think it's possible, if that's what you're asking. I absolutely think it's possible.

Q. More likely than not simply means that it's more than 50 percent likely that that occurred. Or is it still your testimony that—

A. Can I think it's possible and more likely than not?

[Blasius' attorney]: I don't think he understands the question.

[Hooker]: I don't. I do not understand that. I absolutely think it's possible. Are we going to put a percentage on how [confident] I am in thinking it's possible?

Q. I'm just trying to determine whether or not you believe it's a possibility that their work caused it.

A. I absolutely believe that.

Q. Or that it's your expert opinion that their work did cause it.

A. I don't know if it caused it.

> Q. It's just that it's possible based on the time-
> line that it caused the fire?
>
> …
>
> A. More than just the timeline. The timeline
> and the extent of the work that's been done,
> yes. I, yes. I absolutely think it's possible.

Hooker Dep. 57:1–58:15. In assessing the above testimony, we must remember that Hooker's expertise lies in the field of fire investigation, not law. As such, it is improper to reject the fair import of his testimony based upon an apparent inability to decipher legal intricacies with which trained attorneys so often struggle.

Moreover, we must remain cognizant of the proper purpose for which Blasius offers Hooker's expert opinions regarding causation. At the summary judgment phase, Hooker merely helps Blasius *get to* a fact finder; Hooker does not, however, serve *as* the fact finder. To achieve the former, a plaintiff need only produce evidence sufficient to *potentially* persuade *any* reasonable jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) ("[S]ummary judgment will not lie … if the evidence is such that *a* reasonable jury *could* return a verdict for the nonmoving party.") (emphasis added). In essence, Appellee asks us to raise this standard and require that a plaintiff, at the summary judgment stage, show *actual* persuasion of a *particular* person to a *particular* degree of certainty. Obviously, we decline that invitation here.

At summary judgment, Hooker's expert opinions regarding causation remain sufficient, especially since they find further support in the record, including Angel's own admis-

sion to Blasius that Angel thought a fuel leak may have caused the fire (a conclusion based upon Angel's personal involvement in working on the vehicle). Angel Dep. 55:1–5. Such evidence, in conjunction with Hooker's written report and Blasius' personal observations of the fire on scene, goes well beyond the district court's characterization of Blasius' evidence of causation as only "speculation" or mere "hypothesis." *See Newell v. Westinghouse Elec. Corp.*, 36 F.3d 576, 579 (7th Cir. 1994) ("A probability of negligence may be supported by expert testimony or common sense inference."). Construing all reasonable inferences in Blasius' favor, as we must, such evidence furnishes a sufficient factual basis from which a reasonable jury could find in favor of Blasius on the causation element of his negligence action.

Appellee's contrary reliance on *Kincade v. Mac Corp.*, 773 N.E.2d 909 (Ind. Ct. App. 2002) is misplaced. In *Kincade*, a store clerk sued the designers, manufacturers, and installers of a trash compactor system for injuries she received from a fall on a set of access stairs. *Id*. at 911. At the summary judgment stage, defects in the clerk's case were two-fold. First, the clerk admitted that she did not know what caused her feet to slip out from under her, and even worse, presented conflicting testimony regarding possible culprits. *Id*. at 912. Second, the clerk's theories narrowed responsibility to the platform and access stairs *leading* to the trash compactor, not the compactor itself. *Id*. The defendants at issue, however, only had personal involvement in the latter. *Id*. As a result, no question of material fact existed as to whether the clerk's injuries were proximately caused "by any action or inaction on the part of any of the three defendants." *Id*. at 913.

Here, unlike the store clerk, Blasius provided a specific, consistent theory—supported by expert testimony and other evidence—regarding the cause of his vehicle fire: a leak in the Excursion's fluid systems that came in contact with a heated portion of the exhaust system. Hooker Dep. 45:14–16. Furthermore, Blasius tied the source of his injury directly to AAI. The record shows that, to complete the extensive upgrades to Blasius' vehicle, AAI disconnected and reconnected the fluid moving systems. Angel Dep. 15:11–15. Although uncertainty remains as to *which* fluid first ignited, such ambiguity is immaterial since AAI interacted with all of them immediately preceding the fire.

Appellee's reference to our decision in *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672 (7th Cir. 2008), is equally unavailing. In *Trask-Morton*, the plaintiff checked into an Indianapolis Motel 6 alone. *Id.* at 674. Once inside, she took a dose of muscle relaxant and fell asleep. *Id*. The plaintiff had no memory of what occurred between the time she fell asleep and when she regained consciousness the following evening. *Id*. Nevertheless, two days later, the plaintiff reported that she had been sexually assaulted. *Id*. at 676. The plaintiff filed suit against Motel 6, alleging that the hotel failed to provide adequate security. *Id*. Due to the plaintiff's lack of direct memory and the absence of other circumstantial evidence, however, the district court found there was insufficient proof for a reasonable jury to conclude that a sex crime had actually been committed. According to the court, without "facts to support [the plaintiff's] allegation that an assault occurred in the first place," the plaintiff "could not connect the injuries she alleged occurred as the result of the assault to any breach of duty by Motel 6." *Id*. Affirming the lower court's decision, we held that "a jury could not find

that Morton was sexually assaulted … without resorting to impermissible speculation." *Id*. at 679.

This case is not *Trask-Morton*. There, plaintiff was unable to prove that an injury actually occurred, and, without a predicate injury, there can be no proximate cause. Here, AAI does not contest that Blasius' Excursion was destroyed by fire. Thus, while a genuine issue of material fact remains concerning causation, the undisputed presence of an actual injury places the current controversy beyond the import of *Trask-Morton*.

### B.    *Res Ipsa Loquitur*

Cases such as *Kincade* highlight that "negligence may not be inferred from the mere fact that an injury occurred." *Maroules v. Jumbo, Inc.*, 452 F.3d 639, 642 (7th Cir. 2006). Nevertheless, under certain circumstances, negligence "may be inferred from the circumstances *surrounding* the injury." *Id*. (emphasis added). The doctrine of *res ipsa loquitur*—translated, "the thing speaks for itself"—recognizes that "certain accidents are so unusual that the party shown to be in exclusive control of the injuring object ought to be held responsible unless that party can offer a reasonable explanation." *Newell v. Westinghouse Elec. Corp.*, 36 F.3d 576, 579 (7th Cir. 1994).

In other words, *res ipsa loquitur* "is a shortcut to a negligence claim." *Maroules*, 452 F.3d at 642. It "does not require a plaintiff to submit evidence of causation" because it is "a doctrine of common sense. It allows a trier of fact to draw an inference of negligence when evidence of causation is lacking." *Id*. at 644. As we said in *Maroules*,

> [t]o establish this inference of negligence, the plaintiff must demonstrate: (1) that the injuring instrumentality was within the exclusive management and control of the defendant, and (2) that the accident is of the type that does not ordinarily happen if those who have the management and control exercise proper care … Once the plaintiff has met the burden of demonstrating the control and due care prongs of *res ipsa loquitur*, the doctrine operates to permit an inference of negligence based upon the circumstantial evidence.

*Id.* at 642. Satisfying the prima facie elements, however, does not automatically "hand victory" to the plaintiff. *Id*. at 643.

> The inference … is just that—a plaintiff does not win [his] case merely because [he] has met the *res ipsa loquitur* requirements. A successful *res ipsa loquitur* showing simply creates an inference which the trier of fact may choose to accept or not.

*Id.* at 642–43 (internal citations omitted); *Sweeney v. Erving*, 228 U.S. 233, 240, 33 S. Ct. 416, 418, 57 L. Ed. 815 (1913) ("In our opinion, *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict.").

In the end, whether the doctrine of *res ipsa loquitur* applies is a mixed question of law and fact. *Maroules*, 452 F.3d at 643. The question of law is whether the plaintiff's evidence includes all of the underlying elements of *res ipsa loquitur*; the ultimate determination for the trier of fact at trial "is whether the permissible inference is to be drawn." *Id.*

### 1.      Exclusive Management and Control

Here, the district court held that *res ipsa loquitur* did not apply because the Excursion was in Blasius' possession on June 29, 2012 and thus not "under the exclusive control of [AAI] at the time of the fire[.]" Op. and Order 7, ECF No. 68. Such a holding misinterprets the first prong of the *res ipsa loquitur* test.

The "concept of control under Indiana's *res ipsa loquitur* case law is expansive." *Maroules*, 452 F.3d at 643. To prove "exclusive control," a plaintiff "simply is required to show either that a specific instrument caused the injury and that the defendant had control over that instrument *or that any reasonably probable causes for the injury were under the control of the defendant*." *Id.* (emphasis added).

Notably, when "used in the *res ipsa loquitur* context, the term 'control' does not require actual physical dominion over an object." *Newell*, 36 F.3d at 580. Thus, "a defendant need not be in control of the causative instrumentality at the *exact* moment of injury, provided the defendant was the last person in control." *Maroules*, 452 F.3d at 643 (emphasis added). A "product which explodes long after its shipment from the manufacturer may still be, for purposes of *res ipsa loquitur*, in the control of the manufacturer if the probability of other causes is small." *Newell*, 36 F.3d at 580.

In *Newell*, the plaintiff filed suit against Westinghouse Electric Corporation, an elevator maintenance company, after a malfunctioning elevator in the Indiana Bell Telephone Building slammed shut on her. *Id*. at 577. Westinghouse argued that, because several Indiana Bell employees maintained access to the elevator control room between the defendant's maintenance calls, the plaintiff could not establish that Westinghouse "was in sole control of the elevators" at the time of her accident. *Id*. at 580. According to Westinghouse, such joint control raised "the possibility of negligence by another party," and thereby barred an inference of negligence on the part of the defendant. *Id*.

Rejecting this argument, we held that Westinghouse's negligence constituted the "most probable cause" of the plaintiff's injuries. *Id*. Although Indiana Bell employees possessed *access* to the elevator control room, only Westinghouse conducted *service and maintenance* on the elevator. *Id*. Because the accident derived from a mechanical failure, access alone was "of little significance" absent evidence that that the employees "in fact engaged in any repair or maintenance themselves." *Id*.

Here, as in *Newell*, AAI was the sole provider of service and maintenance of the Excursion within the relevant time frame. Although Blasius held possession of (and thus access to) the vehicle at the time it ignited, the record is devoid of any evidence that anyone other than AAI performed any material repair or maintenance work of their own between the time Blasius picked up the Excursion on June 28, 2012 and the moment it burst into flames. Moreover, while the parties dispute the precise cause of the ignition, there is no

evidence indicating that the failure, and resulting fire, were anything but mechanical in nature.

Regardless, "the possibility of *multiple* causes or *multiple* defendants does not automatically defeat the application of *res ipsa loquitur*." *Maroules*, 452 F.3d at 643 (emphasis added). In *Maroules*, a motorist brought suit against the owner of a trucking company and its driver after a wheel broke free from a truck trailer and crashed through the front passenger side of the plaintiff's car. *Id*. at 641. The defendants denied that they possessed exclusive control of the injuring instrumentality and contended that they "had no role in manufacturing the trailer or its wheel studs"; "had no control over the inspection and maintenance of the trailer or its wheel studs prior to the time that [the defendants] purchased the trailer"; and "did not maintain, service, or repair its trailers and their parts, but instead relinquishe[d] control every time it sen[t] its trailers to an outside third party maintenance company to do this work." *Id*.

We conceded that these facts presented "any number of alternative theories for the accident: the stud manufacturer could have negligently or knowingly manufactured defective studs, the maintenance business could have used a faulty power tool to tighten the bolts, or a vandal could have sabotaged the truck wheels." *Id*. Nonetheless, we held that "the possibility that a third party may have negligently manufactured, installed, or maintained the studs does not preclude a finding that [the defendant] had control over the injuring instrumentality." *Id*. at 644. We stated that *res ipsa loquitur* does not demand that the plaintiff "exclude every other possibility other than the defendant's negligence as a cause of the injury." *Id*. Instead, "a plaintiff may point to

several alternative causes of injury and allow the jury to determine which, if any, instrumentality caused the injury." *Id.*

Ultimately, at trial, a plaintiff "must show only that the likelihood of other causes is so reduced 'that the greater probability lies at the defendant's door.'" *Newell*, 36 F.3d at 580 (quoting Fowler V. Harper, *The Law of Torts* § 19.7, at 46 (2d ed. 1986)). Indeed, to hold otherwise "would emasculate" the *res ipsa loquitur* doctrine. *Id*. at 581 (quotations omitted). It is only when a plaintiff cannot "identify *any* potential causes and show that they were in the exclusive control of the defendant" that *res ipsa loquitur* fails to apply. *Maroules*, 452 F.3d at 644 (emphasis added).

In this case, Hooker stated in his written report that the Excursion's fuel and brake systems were "more likely" the cause of the fire. Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 11 at 2. During his deposition, Hooker reiterated that a fluid system leak constituted the "most likely scenario" for the June 29, 2012 blaze, and agreed that "[b]ut for the removal and the manipulation and disassembly" of fluid transfer lines by AAI, the fire would not have occurred. Hooker Dep. 45:13–46:1, 53:24–54:3. Hooker deemed this the "most likely" cause of the fire and opined that, had AAI's repair work not been done, the accident "probably would not have happened." 55:17–56:4. For the purposes of summary judgment, the record in this case clearly satisfies the requirements outlined in *Maroules* and *Newell*.

Appellee's reliance upon *Slease v. Hughbanks*, 684 N.E.2d 496 (Ind. Ct. App. 1997), is also misplaced. In *Slease*, the plaintiff, a steelworker, underwent ankle surgery after a workplace fall. *Id*. at 498. The next evening, the plaintiff noticed a burn on his left thigh. *Id*. Believing that the burn oc-

curred during the surgery, the plaintiff filed a suit against the hospital for medical malpractice. *Id*. The Court of Appeals of Indiana granted summary judgment to the hospital because the plaintiff failed to "point to an instrument in the control of the defendant which was a probable cause of his burn." *Id*. at 500. Although the plaintiff pointed to a "bovie pad" as a potential culprit, the court found that "there [was] nothing in the designated evidence to show that this instrument [had] the potential to cause a burn such as [the plaintiff] received." *Id*.

The record before this Court succeeds where the record in *Slease* failed. Here, unlike in *Slease*, Blasius offered several sources of evidence indicating that a "leak in the [Excursion's] fluid system that came in contact with a heated portion of the exhaust system" was the cause of the vehicle fire. Hooker Dep. 45:14–16. For example, Hooker's report stated that fluids within the Excursion's fluid system could "all be ignited via hot engine and exhaust components." Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 53, Ex. 11 at 1. Moreover, Hooker concluded that the fire originated in the area of the engine compartment where "the fuel lines leading from the fuel tank to the fuel injection pump" as well as the "brake system master cylinder and reservoir" were located—all of which were "manipulated and/or removed and reinstalled" during AAI's work on the vehicle. *Id.* at 2. Hooker also pointed to photographs of the vehicle's exhaust "that show[ed] a portion of the exhaust that wasn't insulated" in that area. Hooker Dep. 54:23–24. In light of the record here, *Slease* is irrelevant.

### 2.      Nature of Accident

Because the district court held that Blasius failed to meet the first prong of the *res ipsa loquitur* inquiry, it did not address whether the fire at issue ordinarily occurs absent the exercise of proper care. Based upon the record, we find this prong satisfied as well.

It should go without saying that vehicle fires of the kind seen here do not occur as a matter of course.[3] We are unconvinced by Appellee's arguments to the contrary. Appellee claims that "[p]arts wear down. Road hazards loosen connections, bend parts and can create leaks and openings. The outdoor elements also affect the operation of the vehicle." Appellee's Br. 15. Appellee ignores that, in this case, the parts were new, and the record presents no evidence of road hazards or inclement weather.

---

[3] *See, e.g. Alfa Romeo, Inc. v. S.S. Torinita*, 499 F. Supp. 1272, 1279 (S.D.N.Y. 1980) ("A car spontaneously starting to burn may give rise to a permissible inference that it was defective, and that a defect existed when it left the hands of the defendant."); *Eversole v. Woods Acquisition, Inc.*, 135 S.W.3d 425, 429 (Mo. Ct. App. 2004) ("Common life experience … suggests it would be extraordinary for fuel lines to leak and cause a major fire in a three-year old vehicle, even with 52,000 miles of use, without an intervening act of manipulation."); *Lee v. Hollywood Car & Truck Rental, Inc.*, 485 So. 2d 843, 843 (Fla. Dist. Ct. App. 1986); *Hinckley v. La Mesa R.V. Ctr., Inc.*, 205 Cal. Rptr. 22, 27 (Cal. Ct. App. 1984) ("[R]elatively new motor vehicles are usually not destroyed by fire in the absence of negligence."); *Gherna v. Ford Motor Co.*, 55 Cal. Rptr. 94, 99 (Cal. Ct. App. 1966) ("We think it is a matter of common knowledge that new automobiles which have been properly driven for only about 1,600 miles do not suddenly develop a fire in the engine compartment without someone's negligence."); *Seneca Ins. Co. v. Vogt Auto Serv.*, 573 N.E.2d 223, 225 (Ohio Mun. Ct. 1991); *cf. Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 604 (Tex. 2004).

Rather, the record indicates that Blasius drove little more than 200 miles before his newly overhauled Excursion burst into flames. It cannot be reasonably said that such an event constitutes an ordinary occurrence of automotive self-combustion. If such were the case, the automobile would cease to serve as society's fundamental mode of transportation. The Government has a significant interest "in protecting the health, safety, and welfare of its citizens." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 485, 115 S. Ct. 1585, 1591, 131 L. Ed. 2d 532 (1995). As a result, the design, manufacture, production, use, and maintenance of vehicles are among America's most heavily regulated industries. *See, e.g.,* National Traffic and Motor Vehicle Safety Act of 1966, as amended, 49 U.S.C. § 30101, *et seq.*; Federal Motor Vehicle Safety Standards, 49 C.F.R. § 571, *et seq.* Government agencies at the federal, state, and local level sponsor and secure automobile safety. Given this pervasive level of public use and attention, we reject AAI's suggestion that the accident in this case is a mere fact of everyday life.

## Conclusion

Our ruling, of course, takes no position regarding Appellant's ability to link his vehicle fire to AAI's conduct by a preponderance of the evidence at trial, nor do we opine upon the strength of Appellant's negligence claim as a whole. Such a determination rightfully belongs in the hands of the fact finder at trial. At present, it is enough to say that a genuine issue of material fact exists as to the proximate cause of the fire that consumed Blasius' vehicle, and that, for the purpose of settling that dispute, Appellant is entitled to rely on the doctrine of *res ipsa loquitur*.

For these reasons, the judgment of the district court is REVERSED and REMANDED for further proceedings consistent with this opinion.